Filed 5/26/21  Kim v. Lee CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| EDWARD KIM et al., | B295665, B303317 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC563651) |
| v. | |
| HELEN LEE et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Maureen Duffy-Lewis, Judge.  Affirmed in part; reversed in part.

Law Office of Jim P. Mahacek and Jim P. Mahacek for Defendants and Appellants.

Law Offices of Donna Bullock and Donna C. Bullock for Plaintiffs and Respondents.

_____

Helen Lee and Young Hee Kim (collectively, defendants) appeal in case No. B295665 from a judgment entered after a jury trial (case No. B295665) in favor of Edward Kim,[1] Ginnie Cho, Seung Kang (collectively, Kim plaintiffs), and GNE Property Management, Inc. (GNE).  Defendants also appeal the denial of their motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

The jury's special verdict found defendants, through their agent John Rhee, contracted with Kim's company GNE to perform remediation work on a multi-unit residential apartment building owned by defendants, but failed to pay GNE for all of the work performed under the contract.  The jury further found defendants, through Rhee, sold the property to Kim, Cho, and Kang while intentionally concealing orders by the Los Angeles County Department of Public Health (Health Department) to remediate multiple public health code violations.

Defendants contend on appeal the trial court erred in allowing Kim to testify at trial with the assistance of a noncertified interpreter and in excluding testimony from the incomplete deposition of Rhee.  Defendants also argue substantial evidence does not support the jury's finding defendants had knowledge of the Health Department orders, or that defendants had a duty to disclose the orders because Kim was reasonably able to discover the orders on his own. Defendants further assert the damages awarded are in excess of that proven at trial.  We reduce the amount of damages but otherwise affirm.

---

[1]     We refer to plaintiff Edward Kim as Kim and to defendant Young Hee Kim by her first name (Young Hee) to avoid confusion.

Defendants separately appeal the trial court's award to the Kim plaintiffs of $412,500 in attorneys' fees (case No. B303317). Defendants do not contest the amount awarded, instead arguing the Kim plaintiffs were not entitled to attorneys' fees under the escrow agreement that consummated the sale because the Kim plaintiffs only asserted tort claims. We conclude the broadly-worded attorney fee provision in the escrow agreement supports recovery of fees for the Kim plaintiffs' fraudulent concealment claim.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *The Complaint and Cross-complaint*

On November 13, 2014 the Kim plaintiffs and GNE filed this action against Lee and Young Hee. The Kim plaintiffs asserted causes of action for fraud and negligent misrepresentation. GNE asserted causes of action for breach of contract and a common count.

Defendants filed a cross-complaint against the Kim plaintiffs, GNE, and Rhee, asserting causes of action for fraud, concealment, conversion, common counts, and breach of contract against Rhee; causes of action for breach of oral contract, intentional or negligent misrepresentation, concealment, and common counts against Kim; and causes of action for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligent interference with prospective economic advantage, and conspiracy against all cross-defendants.

3

B. *The Evidence at Trial*

       1. *Kim plaintiffs' case*

          (a) *Lee and Young Hee's purchase of the property*

Prior to March 2013 Jeanne Salamon and Advanced Pension Programs owned a property located at 716 South Westlake Avenue (the property). The multi-unit apartment building on the property was distressed. At some point prior to March 2013, the property was placed in receivership. Receiver Thomas Coleman hired VPMI Property Management (VPMI), a company owned by Daniel and Adrian Talamentes,[2] to manage the property.

On August 15, 2012 the Health Department issued a notice to Salomon identifying multiple violations of the Los Angeles County Code and state housing laws, including rodent and insect infestations. The notice was signed by Environmental Health Specialist Guadalupe Castruita.

On July 13, 2012 the property was referred to the Rent Escrow Account Program (REAP) (L.A. Mun. Code, § 162.00 et seq.) based on code violations identified by the City of Los Angeles Housing and Community Investment Department (Housing Department).[3] On October 29, 2012 the property

---

[2] Daniel and Adrian Talamentes both testified at trial. We refer to Daniel and Adrian by their first names to avoid confusion.

[3] According to the Housing Department Web site, "REAP encourages owners to make the repairs and return the property to a safe and habitable condition. Tenants of affected units are given a 10% to 50% rent reduction depending on the nature and severity of the violations cited. Tenants have the option to pay their reduced rents to the landlord or into an escrow account

4

entered REAP. When a property is placed in REAP, a portion of all tenants' rental payments are withheld from the owner by the City of Los Angeles.

On March 23, 2013 Rhee[4] purchased the property at a foreclosure auction for approximately $1.3 million on behalf of defendants. After the purchase, the receivership on the property terminated, and VMPI ceased management of the property. Lee and Young Hee hired Rhee to manage the property.

Rhee emailed Adrian and told her he was the agent of Lee and Young Hee and authorized to negotiate on their behalf. Adrian provided Rhee with past operating statements for the property, and Rhee and Adrian discussed the possibility of Lee and Young Hee hiring VPMI to manage the property again. VPMI collected rents from the tenants for Rhee in April 2013. Ultimately, VPMI opted not to manage the property.

> (b)     *Rhee hires Kim and GNE to remediate the property in response to the Housing Department orders*

Sometime in March 2013 Rhee approached Kim, seeking consultation on the Housing Department orders on the property. On March 26 Kim visited the property at Rhee's invitation, while the Housing Department conducted an inspection of the property. Kim believed Rhee wanted him there to show the inspector that

---

managed by the Department." (L.A. Housing & Community Investment Dept., *What is REAP?* (2021) <http://hcidladev.lacity.org/what-is-reap-for-renters> [as of May 12, 2021].)

[4]     Rhee hired real estate broker Simon Wu, who testified at trial, to purchase the property at the auction.

Rhee had a contractor to address problems with the building. Kim did not participate in the discussions between Rhee and Housing Department inspector Erwin Larranaga, but he "listen[ed] to some of the conversations" from the hallway.

Rhee and Kim discussed Rhee's hiring of GNE to perform remediation work on the property. On April 2 or 3, 2013 Kim provided Rhee with a handwritten estimate of $200,000 for GNE to perform the remediation work required by the Housing Department. Rhee stated he needed to discuss the proposal with Lee and Young Hee. On April 3 Kim and Rhee met with Young Hee. In the presence of Kim, Young Hee told Rhee that Rhee was "in charge of everything" regarding the property. Young Hee authorized Rhee to hire Kim as the general contractor to work on the property on her behalf. After this initial meeting, Young Hee relied on Rhee to communicate with Kim. Kim and Young Hee did not meet or speak again.

On April 16, 2013 the Housing Department issued a notice and order to comply to both Rhee and Kim regarding violations on the property. However, the notice addressed to Kim listed an incorrect mailing address. The notice ordered additional work to be performed on the property, which Kim had not accounted for in his original estimate. Rhee asked Kim to perform the additional work and told him Lee or Young Hee would pay him, or Rhee would "sell the building to pay" him.

On April 18 Kim attended a hearing with Rhee regarding the property's inclusion in REAP. At the hearing, Kim did not hear any mention of "pests" or an "unhealthy environment" at the building, or of any Health Department orders. Kim received a copy of the March 26, 2013 Housing Department notice and order for the first time on this date.

Young Hee authorized Rhee to hire Kim and to discuss the needs of the property with Kim while Rhee oversaw the completion of all repairs. Young Hee expected Rhee to handle any problems that arose on the property and authorized him to receive legal notices on her behalf. On April 28 or 30, 2013 Rhee returned to Kim a typed invoice memorializing the terms of Kim's written proposal for GNE to perform the remediation work. Rhee signed the invoice on behalf of Lee and Young Hee. The signed invoice provided GNE would be paid $200,000 for the listed work, with an "extra charge on additional work beyond this list." The invoice provided the property would "[p]ass LAHD [i]nspection" and "[p]ass LADBS [i]nspection," in apparent reference to the Housing Department and the Los Angeles Department of Building and Safety. The scope of the work did not include pest control. Relying on the signed contract, Kim and GNE began to perform the remediation work.

On May 2, 2013 Lee visited the property. Lee told Kim the contract price was too expensive and requested a discount, but she did not tell him to stop work on the property. On May 6 Lee returned to the property. She did not enter the building, but from the outside observed work being performed. At this time, Lee gave Kim two checks totaling $37,000 as partial payment for the work that was underway. In total, Kim received $97,000 as a down payment on the work.

Lee and Young Hee did not pay for utilities, including water and electricity, during July and August 2013. Kim testified he paid between $17,000 and $18,000 for utility bills owed by Lee and Young Hee. According to Kim, it would have been "impossible to continue construction" without paying the utilities. Normal business practice for contractors included

7

paying utilities due and issuing an invoice to the owner, in order to continue work uninterrupted.

In August 2013 GNE completed all of the remediation work under the contract and required by the Housing Department, including that required by the April 16, 2013 notice and order. Neither Lee or Young Hee ever told Kim and GNE to stop working. But neither defendants nor Rhee paid GNE the outstanding balance for the work performed. GNE introduced business records detailing the costs of materials, labor, and other expenses GNE incurred during defendants' ownership of the property to remediate the code violations identified by the Housing Department orders, which Kim testified totaled $197,784.78. Kim calculated the total price of $227,452.50 for the work by applying "the standard markup . . . for [a] general contractor" of 15 percent.

The Housing Department closed its case against the property on August 29, 2013.

(c)     *The Health Department inspects the property*

Carolyn Watson, an environmental health specialist supervisor with the Health Department, testified the general public can access the Health Department records on a particular property by submitting a request to the Health Department. On May 30, 2013 Watson received an email from Larranaga informing her the property had a new owner and the Housing Department had found continuing code violations upon a reinspection of the property. The email identified Lee and Young Hee as the new owners of the property. Watson sent Castruita,

8

who worked with the Health Department's housing task force,[5] to inspect the property. The Health Department's usual practice was to conduct a follow up inspection within 30 days of a property's change in ownership and to inform the new owner of any "outstanding inspection" or "reported investigation against the old owner."

Rhee accompanied Castruita during her inspection. Castruita found "roaches" and "[mouse] droppings in the broiler and the stove" of one of the units. Throughout the inspection, Rhee "badgered" Castruita, arguing with her about the various problems she identified. After the inspection, Castruita prepared a compliance report on the property. Rhee did not tell Kim about Castruita's inspection.

Castruita explained the Health Department requires elimination and exclusion of pest infestations but the Housing Department does not. The Housing Department deals with "just building structure." Castruita opined the eradication and exclusion of pests is a longer and more difficult job than alleviating violations of the housing code. A superficial cleaning up after pests would not be sufficient to address the concerns of the Health Department. Castruita explained, "I'm very good at finding the bugs. . . . I open up the cabinets. I know where they hide. I'll stick my head in the cabinet, and I look up where they have a crease, and there they are . . . ." Castruita added, "I know how to find the roaches. Pull the refrigerator. They like the back part of the refrigerator because it's warm, and then I take my

---

[5] The housing task force is an interagency task force comprised of members of the Los Angeles City Fire Department, City Attorney's Office, City Code Enforcement, and the Health Department.

9

flashlight and I see them . . . . It looks clean, but you haven't gotten rid of the vermin." After the pests were eradicated, structural amendments must be made, such as "seal[ing] every crack, nook, and cranny."

(d)   *The Kim plaintiffs purchase the property and discover the Health Department orders*

On August 29, 2013 the Kim plaintiffs purchased the property from Lee and Young Hee for $1,577,000. Lee and Young Hee relied on Rhee to negotiate the sale and set the price. According to Kim, Rhee drafted the escrow instructions (escrow agreement), which contained the following clause: "AS-IS AND WHERE-IS CONDITIONS: Buyer hereby confirms that they have completed their own and professional inspection and investigation of the subject property and hereby further confirms that they have removed any and all contingencies of this sale/purchase prior to opening of escrow. Buyer also herein acknowledges that they are purchasing the property solely in reliance on Buyer's own investigation, and that no representations or warrants of any kind whatsoever, expressed or implied have been made by Seller. Buyer herein confirms that they are fully aware of all future, existing zoning regulations, other governmental requirements, site, size of lot, and physical condition and other matters affecting the use and the condition of the property and agrees to purchase the property in its present 'As-is' and 'Where-is' conditions without seller's warranty at closing. [¶] The undersigned buyer hereby confirms that they are well aware of existing Housing Authority lien and accept the property in its present lien conditions. Buyer herein also confirms that they have agreed to comply with any and all

required repairs and documentation including but not limited to the payment of any dues, if any, at buyer's cost after closing."

Kim did not hire a professional to inspect the property prior to the Kim plaintiffs' purchase of the property. Kim believed the property was in full compliance with the Housing Department orders. During GNE's work, Kim had observed some evidence of mice and cockroaches, but he believed all buildings had these issues. Kim did not think he needed to check with the Health Department, which he thought dealt with restaurants.

On October 3, 2013 Kim was called by the Housing Department to attend a meeting. On that date Kim met with representatives from the Housing Department as well as the Health Department's housing task force (including Castruita). After the meeting Kim received an inspection report from the Health Department identifying multiple code violations on the property, including rodent and insect infestation. The report stated it was "[r]eissue[d]," and it referenced the August 15, 2012 inspection report, which ordered Salomon (then-owner of the property) to remediate multiple violations, including the presence of rodents and insects. Sometime after the October 3 meeting, Castruita inspected the property with Kim, who was much more cooperative than Rhee had been.

Larranaga did not learn of the Health Department's outstanding order against the property until the October 3, 2013 meeting. Kim testified he had no knowledge of the Health Department's order before the meeting. Rhee previously disclosed to Kim the Housing Department orders, but not the Health Department orders. Rhee never mentioned to Kim before the sale that Rhee met with Castruita during an inspection by the Health Department.

11

Because of the violations identified by the Health Department, the property remained in REAP for an additional three years. Kim suffered a "humongous financial loss" from the undisclosed Health Department issues. If Kim had known about the Health Department issues, he would not have purchased the property.

(e)     *The Kim plaintiffs' damages*

Kim testified the Kim plaintiffs experienced lost rental income due to defendants' concealment of the Health Department orders. The Kim plaintiffs introduced into evidence business records purporting to document a total loss of $272,569[6] in rental income between September 2013 and May 2016, when the property was released from REAP. Kim explained the records represented "[t]wo major losses. First loss is because of the REAP violation, only 50 percent of the rent could be collect[ed]. Second loss, some of the unscrupulous tenant[s] [knew] about the REAP and because of that . . . did not pay any rent."

In May 2016 the property was released from REAP, and the Kim plaintiffs started collecting the full rent from tenants. Further, on April 11, 2017 Kim received $156,400 in back rent held by REAP and $352 in interest. The Kim plaintiffs could not raise tenants' rents while the property was in REAP, and for one year following the release from REAP. In May 2017 the Kim plaintiffs raised the rent by 3 percent, the maximum allowed by the Los Angeles rent stabilization ordinance. Under the ordinance, the Kim plaintiffs could have again raised the rents in

_____

[6]     Dollar amounts have been rounded to the nearest dollar.

May 2018, but they did not due to a tenant lawsuit regarding the property.

The Kim plaintiffs also introduced business records detailing the costs of materials, labor, and other expenses Kim incurred after purchasing the property to remediate the code violations identified by the August 15, 2012 and October 3, 2013 Health Department orders, totaling $436,164.

### 2. *Defense case*

Daniel testified he met with Kim at the property when Kim was working as the contractor, and Daniel told Kim about the various repairs required by the Housing Department. Daniel told Rhee and Kim the property was in REAP and provided Rhee's assistant with a list of "repairs that the city was asking for." On cross-examination, Daniel opined the repairs necessary to alleviate the issues identified by the Housing Department would cost much more than $97,000. Daniel did not inform Kim of the Health Department orders against the property.[7]

Real estate appraisers Benjamin Lara and Michael Frauenthal both testified the fair market value of the property on August 29, 2013 was $1,460,000. They did not include in their valuations the cost of remediating the violations identified by the Health Department as required to remove the property from REAP. Both acknowledged that if additional repairs were required by the Health Department, that would have affected the valuation.

---

[7] Kim acknowledged he had seen Daniel visit the property and observed Daniel and Rhee speaking, but Kim explained his "English is not sufficient to have a direct conversation with [Daniel] and understand him."

13

Real estate consultant Allan Snyder opined the property remained in REAP from October 2013 to February 2016 due to noncompliance with the Health Department's orders. He opined the property's noncompliance was "particularly bad" and a reasonable buyer in Kim's position would have made an inquiry with the Health Department prior to purchase.

C.  *The Special Verdict and Judgment*

On November 11, 2018 the jury returned a special verdict. As to Rhee's agency, the jury found (1) Rhee was the agent of defendants during their ownership of the property; (2) Rhee was authorized by defendants to act on their behalf with regard to the property; (3) Rhee was authorized by defendants to act on their behalf in dealings with the Kim plaintiffs and GNE; (4) Rhee entered into a contract with GNE for construction services in the scope of his agency; (5) Rhee knew about the Health Department code violation case against the property at the time defendants sold the property to the Kim plaintiffs; (6) Rhee's knowledge of the Health Department code violation case was imputed to defendants; and (7) defendants ratified the actions of Rhee concerning the plaintiffs and relating to the property.

As to the Kim plaintiffs' cause of action for fraud, the jury found (1) defendants "directly or through an authorized agent" intentionally failed to disclose facts in the sale of the property that the Kim plaintiffs did not know or could not have reasonably discovered; (2) defendants intended to deceive the Kim plaintiffs; (3) the Kim plaintiffs would have behaved differently if the omitted facts had been disclosed; and (4) the concealment was a substantial factor in causing harm to the Kim plaintiffs. The jury awarded the Kim plaintiffs $992,595 in damages, comprised of

14

lost earnings ($272,569), unspecified past economic damages ($436,164), future economic loss ($22,487), past noneconomic loss, including mental suffering ($85,000), and prejudgment interest ($176,375). The jury found the Kim plaintiffs failed to prove their claim for negligent misrepresentation.

As to GNE's cause of action for breach of contract, the jury found the parties agreed on the terms of the construction contract and GNE performed the work required by the contract, but Lee and Young Hee failed to perform (by not making payment). The jury awarded GNE $141,028 for past economic loss and $72,911 in prejudgment interest, for total damages of $213,939. The jury further found GNE proved its cause of action for common count against defendants, but awarded no damages on that claim.

The jury found Lee and Young Hee failed to prove each of their cross-claims.

On December 10, 2018 the trial court entered judgment in favor of the Kim plaintiffs and GNE.

D.    *Defendants' Postjudgment Motions*

On December 14, 2018 defendants filed motions for judgment notwithstanding the verdict (JNOV) and for new trial. In their postjudgment motions, defendants argued, among other things, plaintiffs' use of a noncertified interpreter and the trial court's exclusion of the transcript of the incomplete deposition of Rhee were error, substantial evidence did not support the fraud verdict, and the jury's damages award was excessive.

The trial court denied the motions on January 16, 2019. As to the motion for new trial, the court ruled there was "[n]o irregularity nor error in the proceedings. Damages are not excessive. Evidence was sufficient to justify the verdict." As to

15

the JNOV motion, the court found the "[d]ecisions made by the jury and their resulting verdict are supported by substantial evidence and by reasonable inferences made from that evidence."

Defendants timely appealed.

## DISCUSSION

A.  *Plaintiffs' Use of a Noncertified Interpreter at Trial Was Not Reversible Error*

1.  *Proceedings below*

During jury selection on October 3, 2018, plaintiffs' attorney Donna Bullock informed the court Kim required a Korean language interpreter for his testimony at trial.  Bullock explained she was in contact with three private translation services regarding Kim's needs at trial but had not yet retained an interpreter.  On October 4 Bullock informed the court the only interpreter available for the next day was a noncertified interpreter with some experience translating court proceedings.  The court responded, "As long as he is sworn in and as long as all counsel agree."  The court asked defendants' attorney Paul P. Lin whether defendants agreed not to object to the proposed interpreter as long as "he had a resume that was appropriate."  Lin agreed.

The next day, Bullock proposed George Park as the Korean language interpreter for Kim.  Park informed the court he had provided translation services in "small claim[s] court and in a hospital and some mediations."  Asked by Lin to state his qualifications, Park responded he had taken training courses in translation for the legal and medical fields.  At Lin's request, Park then engaged in an off-the-record discussion with Lin's legal

16

assistant, who spoke Korean fluently but did not speak fluent English. At the close of the exchange, the court stated, "I think we're fine," and the clerk swore in Park as interpreter. Lin did not object to the use of a noncertified interpreter.

Throughout the trial, Park translated the testimony of Kim and other Korean-speaking witnesses for plaintiffs. Defendants did not use Park to translate during their cross-examination of Kim or the other Korean-speaking witnesses, but instead utilized several certified Korean-language translators.

On October 10 Lin raised issues with Park's translation during Kim's testimony. Defense interpreter Hyoshin Kim stated, "I have observed there were many occasions of omissions, additions, and explanations during the interpretation" and explained that during a series of questions each ending with "while Helen Lee and Young Hee Kim were the owners of the property," Park had failed to include this qualifying language. Park had on one occasion translated "negotiation as consultation, agreed as declared, ignored as denied," and "terms and conditions as process." Park also once interpreted $97,000 as $9,700. After hearing from Park, who indicated not every word could be "100 percent exactly" translated between Korean and English, the court stated, "He's certified from the court. He took an oath. His English is extremely good, and as long as the plaintiff is comfortable with the interpretation that he's heard now." After confirming with Kim he had testified the figure in question was $97,000, the court ruled, "[W]e're going to continue on with the plaintiffs' interpreter, since you're paying him, and it appears that everything is moving along fine. There can be distinctions but not enough for me to remove him from the case." The court added that the defense "may certainly use their own interpreter."

In support of their postjudgment motions, defendants filed a declaration from Julie Wagner, who served as one of defendants' certified interpreters at trial. Wagner averred she "observed numerous errors" in Park's translation of Kim's testimony, providing as examples: "In once instance, he interpreted 'received a payment' as 'received a partial payment'"; "A few times, he added his personal comments addressing the jury while at the witness stand, making the jur[o]rs laugh. At these instances, it was unclear when he was speaking for himself or interpreting"; and "When [Kim's] response became long, [Park] would trail off without completing the interpretation. He would also leave out words."

2.    *Statutory scheme*

"In general, interpreters are required to take an oath and to be certified. (Evid. Code, § 751, subd. (a); Gov. Code, § 68561, subd. (a).)" (*People v. Suarez* (2020) 10 Cal.5th 116, 143 (*Suarez*); accord, *Correa v. Superior Court* (2002) 27 Cal.4th 444, 462 ["[W]ith respect to in-court interpretation by certified interpreters, concerns regarding the competence of the interpreter normally will be met by statutory certification requirements."].) "A trial court, however, may use an interpreter who is not certified if there is 'good cause' to do so. (Gov. Code, § 68561, subd. (a).) In that situation, the court must find, among other things, that good cause exists and that the interpreter is qualified to interpret the proceedings." (*Suarez*, at pp. 143-144; accord, *People v. Superior Court* (*Almaraz*) (2001) 89 Cal.App.4th 1353, 1358 ["interpreters must be certified, unless good cause is shown for using a noncertified interpreter in a particular instance"]; Cal. Rules of Court, rule 2.893(d)(1) ["If after a

18

diligent search a certified or registered interpreter is not available, the judge in the proceeding may either appoint a noncertified or nonregistered interpreter who has been provisionally qualified under (d)(3) or, in the limited circumstances specified in (d)(4), may use a noncertified or nonregistered interpreter who is not provisionally qualified."].)

"'Improper procedures in the use of an interpreter do not rise to the level of a constitutional violation unless they result in prejudice demonstrating defendant was denied his right to a fair trial.'" (*Suarez, supra*, 10 Cal.5th at pp. 144, 148-149 [defendants' examples of "three instances in which interpretations were incorrect or clarified" did not demonstrate the "errors violated his rights or prejudiced him"]; *Almaraz, supra*, 89 Cal.App.4th at pp. 1359-1360 [failure to follow procedural requirements or administer oath for an interpreter alone does not deprive a defendant of the constitutional right to an interpreter]; *People v. Estrada* (1986) 176 Cal.App.3d 410, 414, 416 [no prejudice resulted from use of a noncertified interpreter who had served as defendant's personal interpreter at the preliminary hearing].)

3.      *Defendants have failed to demonstrate prejudice due to Kim's use of Park as an interpreter*

Defendants contend the trial court committed reversible error by failing to follow the procedures of Government Code section 68561 and California Rules of Court, rule 2.893. They argue Kim did not make a diligent search for a certified interpreter and the trial court failed to make a finding a certified interpreter was unavailable or there was otherwise good cause for appointing a noncertified interpreter.

19

We agree with defendants the trial court erred in failing to follow the required procedure for appointing a noncertified interpreter.  The court made no findings with respect to the availability of certified interpreters or whether good cause existed for appointing Park, as required under California Rules of Court, rule 2.893(d)(2)(B) and (C).  We reject plaintiffs' argument Park was appropriately utilized as a noncertified "temporary interpreter."  Under California Rules of Court, rule 2.893(b)(7), "'[t]emporary interpreter' means an interpreter who is not certified, registered, or provisionally qualified, but is used one time, in a brief, routine matter."  A multi-week civil trial is not a "brief, routine matter."

However, defendants have failed to demonstrate the use of Park to translate Kim's testimony was prejudicial.  Throughout the trial, the defendants used their own Korean language interpreters during their examination and cross-examination of witnesses, including their cross-examination of Kim.  The defense interpreters were free to listen to the testimony of Kim and Park's translation to check the accuracy of the translation and raise any concerns with the court during the trial, but they did not do so after initially raising the issue on October 10.  (See *Suarez, supra*, 10 Cal.5th at p. 149 [defendant failed to make a showing in trial court that interpreter had deficient skills, trial court therefore did not err in denying request for "'check' interpreter"]; *People v. Aranda* (1986) 186 Cal.App.3d 230, 237 ["When a showing is made, at trial, that an interpreter may be biased or his skills deficient, one solution may be appointment of a 'check interpreter.'"].)  Although Wagner submitted a declaration in support of defendants' posttrial motions pointing to some examples of incorrect translations, defendants have not

shown how those errors affected the outcome at trial or otherwise prejudiced defendants. Thus, defendants have not shown they were denied a fair trial, and any error was harmless.[8] (*Suarez, supra*, 10 Cal.5th at pp. 148-149.)

B.  *The Trial Court Did Not Abuse Its Discretion in Excluding Testimony from the Incomplete Deposition of Rhee*
    1.  *Proceedings below*
    On October 26, 2018, near the close of the defense case, Lin requested to read into evidence excerpts from the November 4, 2016 deposition of Rhee. The court found that Rhee, by failing to appear at the trial after the first day, had voluntarily absented

---

[8]     In their reply brief, defendants argue the trial court authorized Park "to make partial translations of the questions asked and Kim's answers." Defendants rely on an exchange between Park and the trial court, in which Park asked, "I'm going to have to ask [Kim] to cut off [his answers] a little shorter. Can I do that?" The trial court responded, "Yes. Answer even if it's only partial. Just interpret it, even if it's only partial." Defendants did not object at trial nor did they raise this contention in their opening brief. Thus, the issue is forfeited. (See *Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 397 ["'It is hornbook law that a timely and specific objection is required to prevent the consideration of certain evidence; the failure to object at all waives any claim of error.'"]; *Aptos Council v. County of Santa Cruz* (2017) 10 Cal.App.5th 266, 296, fn. 7 ["Issues not raised in the appellant's opening brief are deemed waived or abandoned."]; *Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 63 [argument made for the first time in reply brief is forfeited].) Even if defendants had not forfeited this argument, the trial court did not err in allowing Park to translate Kim's partial answers.

himself from the trial. Bullock objected to introduction of Rhee's deposition testimony because plaintiffs did not have an opportunity fully to cross-examine him.

At an in camera hearing, Lin explained, "Bullock was at the deposition. She did have a chance to cross-examine . . . Rhee. [¶] However, at 5:00 we broke and Ms. Bullock had more questions to ask and John Rhee and his lawyer promised to set up a date. Actually, we had set up . . . [a date] a week afterwards, and they cancelled. [¶] And we didn't have a chance to further depose him either." Bullock responded, "Rhee canceled and I set his deposition date at least two other times. I got certificates of non-appearance. Same difficulty we're having here at this trial. [¶] . . . [Lin is] going to read in statements from Mr. Rhee denying knowledge about everything relating to the transactions. Just, 'no, no, no,' and 'I don't knows.' So we didn't get a chance to cross-examine." Lin added, "And on our side, we didn't have a chance to further depose him either" because direct examination was "cut off in the middle and then he wouldn't show up. And [Bullock] didn't get a chance to re-examine at the end." The court asked Bullock whether, during the deposition, she intended "to challenge those questions and ask specifics about them," to which Bullock replied, "Oh, yes." The court sustained Bullock's objection, stating, "That causes the court to rule that she's not had a chance to cross-examine him." After the trial court excluded the Rhee deposition, the defense rested.

In support of their postjudgment motions, defendants filed the excerpts of Rhee's deposition they had intended to introduce at trial.

2. *Exclusion of the incomplete deposition was not an abuse of discretion*

Code of Civil Procedure section 2025.620 provides, "At the trial or any other hearing in the action, any part or all of a deposition may be used against any party who was present or represented at the taking of the deposition, or who had due notice of the deposition and did not serve a valid objection under Section 2025.410, so far as admissible under the rules of evidence applied as though the deponent were then present and testifying as a witness, in accordance with the following provisions:  . . . [¶] . . . [¶]  . . . (c)  Any party may use for any purpose the deposition of any person or organization, including that of any party to the action, if the court finds any of the following:  . . .  [¶] . . . (2) The deponent, without the procurement or wrongdoing of the proponent of the deposition for the purpose of preventing testimony in open court, is any of the following:  . . .  [¶] . . . [¶] . . . (D) Absent from the trial or other hearing and the court is unable to compel the deponent's attendance by its process."

"'Generally, the admission of a deposition is a matter within the discretion of the trial court.'" (*Sprague v. Equifax, Inc.* (1985) 166 Cal.App.3d 1012, 1042 (*Sprague*); accord, *People ex rel. Harris v. Sarpas* (2014) 225 Cal.App.4th 1539, 1555 [explaining as to admission of deposition testimony at trial, "Trial court rulings on the admissibility of evidence, whether made in limine or during trial, are usually reviewed under the abuse of discretion standard."].)  "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.'" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773; accord, *Olive v. General*

23

*Nutrition Centers, Inc.* (2018) 30 Cal.App.5th 804, 817 ["A ruling will be deemed an abuse of discretion only if it is "'so irrational or arbitrary that no reasonable person could agree with it.'"'"].)

"Where cross-examination was not completed, the trial court's refusal to admit the deposition is not ordinarily an abuse of discretion." (*Sprague, supra*, 166 Cal.App.3d at p. 1042 [trial court did not abuse its discretion in excluding deposition testimony of witness where second day of deposition was cancelled and plaintiff could not complete cross-examination]; cf. *George v. Double-D Foods, Inc.* (1984) 155 Cal.App.3d 36, 44 [trial court did not abuse discretion in allowing use of deposition transcript where witness was cross-examined but corrections were later made to the transcript].)[9] "Particularly where . . . the court has taken evidence in the form of declarations and testimony at the hearing on admissibility of the deposition, the court's determination is entitled to great weight on appeal, including substantial evidence effect as to any disputed issues of fact." (*Sprague*, at p. 1042.)

Defendants contend the trial court abused its discretion because plaintiffs failed to move to compel Rhee to complete the

---

[9] *Pollard v. Pollard* (1959) 166 Cal.App.2d 698, relied on by defendants, is not to the contrary. There, a witness died before his deposition could be completed, and there was no opportunity for cross-examination. The Court of Appeal affirmed the trial court's exclusion of the testimony, noting a cited out-of-state authority "specifically limits admission of a partially completed deposition to cases where the cross-examination 'has not in any way been prevented' by the party producing the witness." (*Id.* at p. 705.) The court did not address the circumstances under which it would be an abuse of discretion to exclude testimony in the absence of misconduct by the party producing the witness.

deposition and defendants were not at fault for Rhee's failure to appear. But it was defendants who sought to use Rhee's deposition testimony at trial, and nothing prevented them from moving to compel Rhee's attendance at his continued deposition. And as the parties seeking to call Rhee as a witness at trial, defendants bore the burden to exercise reasonable diligence to procure Rhee's attendance at trial. (Code Civ. Proc., § 2025.620, subd. (c)(2)(E) [party may use deposition testimony at trial if court finds the deponent is absent from trial and the "the proponent of the deposition has exercised reasonable diligence but has been unable to procure the deponent's attendance by the court's process"].) Further, the absence of meaningful cross-examination undermines the reliability of the Rhee's deposition testimony. Under these circumstances, the trial court acted within its discretion in excluding Rhee's deposition testimony.

C.    *Substantial Evidence Supports the Jury's Findings on the Kim Plaintiffs' Claim for Fraudulent Concealment*

Defendants contend substantial evidence does not support the jury's findings of liability for fraudulent concealment because the Health Department orders were issued after defendants' sale of the property to the Kim plaintiffs; Rhee's knowledge of the Health Department orders cannot be imputed to defendants; the Kim plaintiffs agreed to purchase the property "as-is"; and Kim failed to check available public records to discover the Health Department orders. None of these contentions has merit.

1.    *Applicable law and standard of review*

"In evaluating the evidentiary validity of a jury's verdict, our task is merely to assess whether the record contains

25

'substantial evidence, contradicted or uncontradicted, which will support' the verdict. [Citation.] In assessing the substantiality of the evidence, we 'review the record in the light most favorable to the' verdict, resolve all conflicts in favor of the verdict, and draw all reasonable inferences in favor of the verdict. [Citation.] Through this prism, we may not reweigh the evidence [citation] and the testimony of a single witness can constitute substantial evidence [citation]." (*Flores v. Liu* (2021) 60 Cal.App.5th 278, 296; accord, *Shirvanyan v. Los Angeles Community College District* (2020) 59 Cal.App.5th 82, 98.)[10]

"The elements of a cause of action for fraudulent concealment are: (1) concealment of a material fact; (2) by a defendant with a duty to disclose; (3) the defendant intended to defraud by failing to disclose; (4) plaintiff was unaware of the fact and would not have acted as it did had it known the fact; and (5) damages." (*Butler America, LLC v. Aviation Assurance Co., LLC* (2020) 55 Cal.App.5th 136, 144; accord, *Burch v. CertainTeed Corp., supra*, 34 Cal.App.5th at p. 348.) "With respect to concealment, "[t]here are 'four circumstances in which nondisclosure or concealment may constitute actionable fraud:

_____

[10] We apply the same substantial evidence standard to an appeal from the denial of a motion for JNOV or a motion for new trial based on lack of evidence. (See *Burch v. CertainTeed Corp.* (2019) 34 Cal.App.5th 341, 348 [""A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.""]; *Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 514, fn. 7 ["The denial of a new trial motion is reviewed for an abuse of discretion, except that a trial court's factual determinations are reviewed under the substantial evidence test."].)

26

(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.'"' [Citation.] The latter three circumstances "'presuppose[] the existence of some other relationship between the plaintiff and defendant in which a duty to disclose can arise.'"'" (*Burch*, at pp. 349-350; accord, *Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1186-1187.) "Reasonable or justifiable reliance on the nondisclosure is an element of such fraud. [Citation.] "'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.'"' (*Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1383 (*Alfaro*).)

A contract between a seller and buyer of property creates a relationship from which a duty to disclose may arise. (*Alfaro, supra*, 171 Cal.App.4th at p. 1383 ["It is fraud to suppress a fact with intent to induce a person to enter into a contract to acquire realty."]; see *Burch v. CertainTeed Corp., supra*, 34 Cal.App.5th at pp. 349-350 [The relationship creating a duty includes one "between ""seller and buyer, employer and prospective employee, doctor and patient, or parties entering into any kind of contractual arrangement."""].) "'[W]here the seller knows of facts materially affecting the value or desirability of the property which are known or accessible only to him and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer, the seller is under a duty

27

to disclose them to the buyer.'" (*Holmes v. Summer* (2010) 188 Cal.App.4th 1510, 1518-1519; accord, *Roche v. Hyde* (2020) 51 Cal.App.5th 757, 821 ["[I]n 'mere nondisclosure' cases, the plaintiff has the burden to show that the seller knew the undisclosed information was 'not known to, or within the reach of the diligent attention and observation of the buyer.'"].)

2. *The Health Department orders predate the Kim plaintiffs' purchase of the property*

Contrary to defendants' contention, there was substantial evidence the Health Department orders and underlying code violations existed before the Kim plaintiffs purchased the property. The Health Department issued a citation against the property in August 2012, before the Kim plaintiffs—and even Lee and Young Hee—purchased the property. After defendants purchased the property, Health Department inspector Castruita toured the property with Rhee, informed him of the code violations, and issued a new compliance report on the property. The October 3, 2013 inspection report issued to Kim makes clear the Health Department's August 2012 report was "being reissued" to the new owner.

3. *The jury properly imputed Rhee's knowledge and conduct as an agent to Lee and Young Hee*

Defendants contend Rhee's knowledge of the Health Department orders cannot be imputed to them as principals for purposes of the intentional tort of fraudulent concealment. The law is to the contrary.

An agent is "'one who represents another . . . in dealings with third persons.'" (*RSB Vineyards, LLC v. Orsi* (2017)

28

15 Cal.App.5th 1089, 1100, quoting Civ. Code, § 2295.)[11] Section 2332 provides, "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." "So long as the agent was under a duty to disclose certain information, the principal is bound by the agent's knowledge of that information whether or not the agent communicated it to the principal. [Citations.] For this purpose, there is no difference between constructive and actual notice." (*Santillan v. Roman Catholic Bishop of Fresno* (2008) 163 Cal.App.4th 4, 10-11; accord, *Herzog v. Capital Co.* (1945) 27 Cal.2d 349, 353 [knowledge of agent, who acted within scope of his agency when he caused structural defects in real property to be concealed from buyer, was properly imputed to principals]; cf. *RSB Vineyards, LLC v. Orsi, supra*, 15 Cal.App.5th at pp. 1101-1102 [construction workers' knowledge of structural defects not imputed to property owner where workers were not acting as agents of owner].)

A principal's liability extends to fraudulent conduct of the agent. As section 2338 provides, "a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business, *and for his willful omission to fulfill the obligations of the principal.*" (Italics added; see *Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 295, fn. 2 ["[S]ection 2338, which has been termed a codification of the respondeat

---

[11] Further undesignated statutory references are to the Civil Code.

29

superior doctrine [citation], is not limited to employer and employee but speaks more broadly of agent and principal; it makes the principal liable for negligent and 'wrongful' acts committed by the agent 'in and as part of the transaction of such [agency] business.'"].)  "'If the principal places the agent in a position to defraud, and the third person relies upon his apparent authority to make the representations, the principal is liable even though the agent is acting for his own purposes.'"  (*Alhino v. Starr* (1980) 112 Cal.App.3d 158, 174, italics omitted; accord, *Spahn v. Guild Industries Corp.* (1979) 94 Cal.App.3d 143, 156 ["[A]n agent's liability for compensatory and punitive damages may be imputed to even an innocent principal."]; *Eamoe v. Big Bear Land & Water Co.* (1950) 98 Cal.App.2d 370, 374 ["[W]hen an agent on behalf of his principal performs an unauthorized act, if the principal has put the agent in a position to mislead innocent parties, he is responsible to the latter."].)

Substantial evidence supports the jury's findings Rhee acted as an agent of defendants; he was authorized to act on defendants' behalf with respect to the sale of the property to the Kim plaintiffs; he knew about the Health Department code violations; and his knowledge should be imputed to defendants. Lee testified she and Young Hee relied on Rhee to manage the property, to negotiate the sale to the Kim plaintiffs, and to set the sale price.  Young Hee authorized Rhee to receive legal notices on her behalf, told Rhee in Kim's presence that Rhee was "in charge of everything" regarding the property, and authorized Rhee to hire Kim as the general contractor to remediate the property.  By relying on Rhee as their agent, defendants placed Rhee in a position to mislead the Kim plaintiffs by his concealment of the Health Department orders.  Rhee accompanied Castruita during

her inspection following defendants' purchase of the property in which he learned of the significant pest infestation problems in the building. During the inspection, Rhee would have observed Castruita's investigation of "every crack, nook, and cranny," making Rhee aware of the difficulty of discovering the extent of the pest problem. But Rhee never advised Kim of the Health Department violations at the property, instead only discussing with Kim the Housing Department citations and negotiating an agreement for remediation by GNE limited to the Housing Department violations. Further, Rhee set the sale price of the property at a level that did not reflect a reduction for the Health Department orders, showing he was aware of Kim's ignorance of the Health Department violations. As defendants' real estate appraisal experts testified, the Health Department orders would have negatively affected the valuation of the property at the time of sale.

4. *The "as-is" clause of the sales contract does not preclude the Kim plaintiffs' suit for fraud*

Defendants' contention that the "as-is" clause in the escrow agreement bars the Kim plaintiffs' fraudulent concealment claim lacks merit. Section 1668 provides, "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." "It is well established in California that a party to a contract is precluded under section 1668 from contracting away his or her liability for fraud or deceit based on intentional misrepresentation." (*Manderville v. PCG&S Group, Inc.* (2007) 146 Cal.App.4th 1486,

31

1500; accord, *Blankenheim v. E. F. Hutton & Co.* (1990) 217 Cal.App.3d 1463, 1471 [under section 1668, "a party may not contract away liability for fraudulent or intentional acts"]; *Smith v. Rickards* (1957) 149 Cal.App.2d 648, 653-654 [provision in purchase agreement stating "'[b]uyer has personally examined said property and is familiar with its location and condition and is not relying upon any representation relating thereto'" did not bar buyer's claim for fraud].)  "[A] sale 'as is' is not the equivalent of a waiver of potential claims of misrepresentation. . . .  [T]he 'as is' sale simply means the buyer accepts the property in the condition visible or observable by him." (*Loughrin v. Superior Court* (1993) 15 Cal.App.4th 1188, 1195.)

Defendants' reliance on *Driver v. Melone* (1970) 11 Cal.App.3d 746 (*Driver*) is misplaced.  There, the sellers' real estate broker told the plaintiff buyer, who was an experienced real property investor with a degree in engineering, that the property was "a dog," in "really . . . bad shape," and "dangerous" with "faulty wiring." (*Id.* at p. 749.)  Further, the building inspector advised the buyer to obtain an authorization letter from the current owner to access the building records, but the buyer did not do so.  (*Id.* at pp. 749-750.)  The buyer purchased the property "as-is," then sued the seller after the building was condemned due to defective wiring.  (*Id.* at pp. 748, 750.)  The Court of Appeal affirmed the judgment for the sellers, explaining a purchase agreement's inclusion of an as-is clause "does not in itself protect the sellers or absolve them from liability for misrepresentation or passive concealment." (*Id.* at p. 752.)  Rather, "it is a factor to be considered with all other circumstances in determining whether the buyer has been misled." (*Ibid.*)  The Court of Appeal observed there was no

evidence the sellers had any information that was unknown or beyond the reach of the buyer, nor was there evidence the buyer was induced to purchase the property by the nondisclosure of material information. (*Id.* at p. 753.)

By contrast, Rhee extensively discussed with Kim the Housing Department order but never disclosed the Health Department's demands. According to Castruita, the pest problems at the property were difficult to detect and required use of a flashlight to search dark areas where pests lived. Kim did not observe the severity of the pest problems until he accompanied Castruita on her inspection of the property after the Kim plaintiffs purchased the property. The jury was free to consider the as-is clause, but it was also free to conclude it did not bar the Kim plaintiffs' recovery.

5. *Knowledge of the Health Department public records is not imputed to Kim*

Contrary to defendants' contention, Kim's failure to search the public records before purchasing the property does not, as a matter of law, preclude the Kim plaintiffs from recovery. "'Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent.' [Citation.] 'Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man.'" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239-1240; accord, *Seeger v. Odell* (1941) 18 Cal.2d 409, 414-415 ["The fact that an investigation would have revealed the falsity of the misrepresentation will not alone bar his recovery [citations], and it is well established that he is not held to constructive notice of a

33

public record which would reveal the true facts."]; *Bishop Creek Lodge v. Scira* (1996) 46 Cal.App.4th 1721, 1734 ["Under a long line of cases, the fact that the victim had constructive notice of the truth from public records is no defense to fraud. The existence of such public records may be relevant to whether the victim's reliance was justifiable, but it is not, by itself, conclusive."].) "'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.'" (*Alliance*, at p. 1239.)

The principle that constructive notice of a public record is not a bar to a fraud action applies in fraudulent concealment cases. (See *Alfaro, supra*, 171 Cal.App.4th at p. 1389 [purchasers of residences were not charged with constructive notice of deed restrictions as defense to their claims against sellers for fraudulent concealment of the restrictions, but defendants could present evidence of plaintiffs' actual knowledge of documents presented to them or inquiry notice based on those documents]; *Bishop Creek Lodge v. Scira, supra*, 46 Cal.App.4th at pp. 1734, 1736 [purchaser of lodge was not charged with constructive notice of settlement by seller with owner of neighboring property under which restrictive covenant on neighboring property was removed, in action by purchaser for fraudulent concealment of judgment declaring covenant unenforceable, but seller could present evidence that lis pendens on lodge was removed as part of settlement to show purchaser had actual knowledge].)

The cases relied on by defendants are distinguishable. In *Barnett v. Marsili* (1933) 131 Cal.App. 337, the parties in the lawsuit, unlike here, were the victims of a third party's fraud. The plaintiff buyer had purchased a car from a dealer but never

34

obtained the registration. (*Id.* at p. 338.) Four months after the sale the dealer secured a loan against the car without the buyer's knowledge, and the lenders registered the car in their names. (*Ibid.*) The Court of Appeal affirmed the trial court's judgment for possession of the car to the lenders, reasoning that the lenders and buyer were innocent, but because the buyer was negligent in failing to register the car in his name, he had to bear the loss caused by the dealer's fraud. (*Id.* at p. 339.) In *Stevenson v. Baum* (1998) 65 Cal.App.4th 159, the buyers of property sued the sellers for failure to disclose an easement on the property for an oil pipeline. (*Id.* at pp. 162-163.) The Court of Appeal affirmed the trial court's grant of summary judgment for the sellers, reasoning that the purchase contract stated the buyer took title subject to easements of record, and thus did not conceal that there was a recorded easement for a pipeline. (*Id.* at p. 166.) Here, the escrow agreement did not mention the Health Department orders despite expressly noting the "existing Housing Authority lien" on the property. Thus, in contrast to *Stevenson,* the agreement did not place the Kim plaintiffs on notice of the Health Department orders.

Defendants argue Kim, as an experienced investor and general contractor, should have been on notice there were Health Department violations (and thus checked the public records) as a result of his visit to the property in March 2013 during which he would have observed the property's condition. But there was no evidence of Kim's special knowledge of pests or pest control.[12] Although Kim observed some evidence of pests at the property

---

[12] Defendants assert Kim was a "pest control licensee" but do not support this assertion with a citation to the record.

35

during GNE's construction work, he testified he believed all properties have some pest issues. And, as discussed, Castruita testified pest issues were frequently not apparent. Even Larranaga, who inspected the property for Housing Department violations, was unaware of the Health Department violations. Based on this evidence the jury could reasonably have concluded Kim was not aware of and did not have reason to discover the Health Department violations, and thus defendants had a duty to disclose these facts to him.

D.  *Substantial Evidence Supports the Jury's Award of Damages to GNE for Work Performed on the Property*

Defendants contend the jury's award to GNE of approximately $141,000 in damages plus prejudgment interest for breach of contract was excessive. They argue GNE agreed to perform the remediation work for $200,000 and was paid $97,000, so the damages should not exceed $103,000. Further, they assert the contract was never modified and defendants did not agree to pay GNE to perform the additional work. Defendants' arguments are not persuasive.

In early April 2013 Kim gave Rhee a handwritten estimate of $200,000 for GNE's remediation. On April 16 the Housing Department issued a notice and order to comply, which identified violations requiring remediation work in addition to the work included in Kim's handwritten estimate. On April 28 or 30 Rhee returned to Kim a typed invoice signed by Rhee memorializing the terms of Kim's handwritten proposal. The invoice stated GNE would be paid $200,000 for the listed work, with an "extra charge on additional work beyond this list." Rhee asked Kim to perform the additional work required by the April 16 Housing

36

Department order and told Kim he would be paid for the additional work. As discussed, Rhee had authority to reach this agreement on behalf of defendants. Young Hee told Rhee he was "in charge of everything" regarding the property, and Young Hee had authorized Rhee to hire Kim and GNE to work on the property.

Defendants argue GNE did not submit any written change orders, and therefore there was no agreement between GNE and defendants for performance of the additional work. However, the signed invoice does not require written change orders, instead stating only that GNE would charge for "additional work beyond this list." As Kim testified, the work required by the April 16 Housing Department order was beyond that included in the invoice, and the terms of the signed invoice contemplated an extra charge for that work.

Further, Rhee's agreement on behalf of defendants to pay for GNE's work to comply with the April 16 Housing Department order was an enforceable oral modification of a written contract. (See § 1698, subd. (b) ["A contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties.]; *Conley v. Matthes* (1997) 56 Cal.App.4th 1453, 1465 ["[A] contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties" as long as the written contract does not by its terms require modifications to be made in writing and the modification is supported by new consideration].)

Defendants alternatively argue any agreement between Rhee and GNE for the additional work is unenforceable because it failed to set a price for the work. Not so. Although Kim and Rhee did not agree on a specific price, GNE was entitled to

37

recover for the reasonable value of the additional work performed. As the Supreme Court explained in *City Street Improv. Co. v. Kroh* (1910) 158 Cal. 308, 323, overruled in part on other grounds by *Pasadena v. Charleville* (1932) 215 Cal. 384, "In cases where extra work is caused by authorized deviations from a building contract, and no agreement is made regarding the price thereof, or payment therefor, the law implies an agreement by the owner to pay the reasonable value of the extra work." (Accord, *Benson Electric Co. v. Hale Bros. Associates, Inc.* (1966) 246 Cal.App.2d 686, 697 ["[T]he authorized 'extras' are in effect a separate implied contract under which appellants must pay a reasonable price, since none was provided at the time the 'extras' were installed." Italics omitted.]; *C. F. Bolster Co. v. J. C. Boespflug Constr. Co.* (1959) 167 Cal.App.2d 143, 151 ["Where the extras are of a different character from the work called for in the contract and no price is agreed on for extra work, their reasonable value may be recovered."].) Defendants do not argue GNE's recovery is unreasonable based on the actual work performed. Thus, substantial evidence supports the jury's inclusion of approximately $28,000 for additional work performed by GNE and included in GNE's demand for payment.

The jury's damages award to GNE also includes approximately $10,000 for the payment of the property's utilities by GNE. Kim testified he spent $17,000 or more on utilities in order to perform the construction work required by the contract, in accordance with normal business practices for contractors.[13] Although Lee admitted during trial that defendants did not pay

---

[13]   The utility bills paid by GNE were admitted as trial exhibits.

38

for the property's utilities during their ownership, defendants argue neither they nor Rhee authorized Kim or GNE to pay the utilities on behalf of defendants.  But defendants had an obligation to pay for the utilities so GNE could perform its work (which required electricity and running water) as part of the covenant of good faith and fair dealing implied into every contract.  (See *Chu v. Old Republic Home Protection Company, Inc.* (2021) 60 Cal.App.5th 346 ["'The essence of the implied covenant is that neither party to a contract will do anything to injure the right of the other to receive the benefits of the contract.'"]; *Howard Contracting, Inc. v. G.A. MacDonald Construction Co.* (1998) 71 Cal.App.4th 38, 50-51 ["[I]n every construction contract the law implies a covenant that the owner will provide the contractor timely access to the project site to facilitate performance of work."].)  GNE's payment of the utilities was a reasonable step taken to complete performance, thereby mitigating damages that would have flowed from defendants' breach of contract had they failed to ensure the construction site had the necessary electricity and water.  (See *Agam v. Gavra* (2015) 236 Cal.App.4th 91, 111 [""[A] plaintiff who suffers damage as a result of . . . a breach of contract . . . has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been thus avoided.""].)  Therefore, substantial evidence supported the jury's award of damages to cover GNE's payment of the utility bills.

E.  *Substantial Evidence Supports Some but Not All of the Jury's Award of Damages to the Kim Plaintiffs for Fraudulent Concealment*

1.  *Governing law*

"As a general matter, in fraud claims involving the purchase, sale or exchange of property, the Legislature has directed that the 'out-of-pocket' rather than the 'benefit-of-the-bargain' measure of damages should apply." (*Moore v. Teed* (2020) 48 Cal.App.5th 280, 289; accord, *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 334.)  Section 3343, subdivision (a), provides, "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction," including enumerated damages such as lost use and enjoyment and lost profits.  Damages recoverable under section 3343 include "expenses and other consequential damages stemming from the fraud." (*O'Neil v. Spillane* (1975) 45 Cal.App.3d 147, 159.)

"'Damage to be subject to a proper award must be such as follows the act complained of as a legal certainty . . . .'" (*Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1048.)  Damages do not flow from a defendant's act if there is "'[a] superseding cause[, that] is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent [misconduct] is a substantial factor in bringing about.'" (*Brewer v. Teano* (1995) 40 Cal.App.4th 1024, 1031; accord, *Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1166 ["[I]f damages do not flow

40

from the concealment, but rather from some other extrinsic factor, the award of damages would be improper."].)

2.  *Substantial evidence supports the jury's award of economic damages for the cost of remediation*

The jury awarded the Kim plaintiffs $436,164 for "other past economic damages." Defendants contend this award is improper because it duplicates the damage award for lost rental income. However, it is clear from the record this award did not duplicate the Kim plaintiffs' claimed lost rental income, but rather, was to compensate them for the expenses incurred to remediate the code violations identified in the concealed Health Department orders. Section 3343 authorizes recovery of damages including "expenses . . . stemming from the fraud" (*O'Neil v. Spillane, supra*, 45 Cal.App.3d at p. 159), and defendants make no argument to the contrary.

3.  *Substantial evidence supports a portion of the jury's award of damages for lost earnings*

The jury awarded the Kim plaintiffs $272,569 for lost earnings. Defendants argue substantial evidence does not support this part of the jury's award because the Kim plaintiffs received the rental income held by REAP after the property exited the program, and the lost rent due to "unscrupulous tenants" who elected not to pay any rent is not fairly attributable to defendants' concealment of the Health Department orders. Defendants are correct as to the lost rent attributed to the unscrupulous tenants, but not the remainder of the lost rental income awarded by the jury.

41

The business records the Kim plaintiffs introduced at trial to support their claim for lost rental income include for each year from 2013 through 2016 a table with five columns labeled "RENT," "REAP Collect," "Paid to Owner," "Vacancy," and "Rent Loss." In each row, representing a given month of the year, the amounts in the REAP collect, paid to owner, and vacancy columns are subtracted from the rent column to calculate the number in the rent loss column. The monthly amounts of rent loss are then added together to compute a subtotal. A second table titled "REAP Uncollected Rent" ascribes to four or five apartment units uncollected rent amounts, the sum of which is added to the rent loss subtotal, to compute the purported total lost rental income for the year.

Kim explained that the charts show "all the financial loss due to the citation that was issued by [the] Health Department following also with REAP." He added as to the 2014 chart, "This represents two major financial losses. [The] first loss because of the REAP violations and the Health Code, I've lost 50 percent of the rent. Second loss, since . . . the building was under REAP control by then, the five units had not paid the rent, and there's no action I could have taken legally." Kim testified similarly as to the 2014 and 2015 charts, except that in 2015 and 2016 only four units did not pay rent.

Even considered together with Kim's testimony at trial, the tables are difficult to understand. Kim testified the lost rental income was attributable to a 50 percent reduction in the rent resulting from the REAP program and tenants who withheld all rent payments while the property was in REAP. Ostensibly, the REAP collect column represents the amount paid to REAP instead of to the Kim plaintiffs, although these figures are

42

consistently less than 50 percent of the total rent amount. At the same time, the rent loss column does not reflect a loss of more than 50 percent of the rent claimed by the Kim plaintiffs for all apartment units. Although it is not clear exactly how each column was calculated, defendants stipulated to admission of the document, and Kim testified based on the document as to the total rent losses the Kim plaintiffs suffered for each year. The jury awarded to the Kim plaintiffs the "total" rent loss for the years 2013 through 2016 reflected in the exhibits ($272,569).

Further, to the extent the REAP collect column represents the amount paid into the REAP program (which the Kim plaintiffs later recovered),[14] the paid to owner column reflects sums the tenants paid directly to the Kim plaintiffs, and the vacancy column reflects the lost rent due to vacancies (instead of from REAP), subtracting those sums from the total rent due for all apartments in REAP reasonably constituted the Kim plaintiffs' loss from placement of the apartment units in the program. These amounts totaled $35,520 in 2013; $88,337 in 2014;[15] $83,444 in 2015; and $35,298 in 2016. Substantial evidence therefore supports this portion of the jury's award for lost income, totaling $242,599.

---

[14] Kim testified all rental income held in REAP was released to the Kim plaintiffs in April 2017 after the property exited the program.

[15] Because defendants failed to include in the appellate record exhibit 220 with the calculation for the REAP uncollected rent from the five units that refused to pay rent in 2014, we include the total amount of uncollected rent for 2014 according to Kim's testimony.

However, substantial evidence does not support the jury's award to the extent it reflects the unpaid rents of the "unscrupulous tenant[s]" who failed to pay their rent to the Kim plaintiffs or to REAP. These losses were not fairly attributable to defendants' concealment, but rather, resulted from the unlawful misconduct of the tenants who refused to pay rent due under the terms of their leases with the Kim plaintiffs.

4. *Substantial evidence does not support the jury's award of future economic loss*

Defendants contend substantial evidence does not support the jury's damages award of $22,487 for future economic loss. This contention has merit. The Kim plaintiffs argue the award was for "future lost profits from loss of yearly rental increases which would have been allowed by the Los Angeles Rent Stabilization Ordinance . . . if the Property had not been held up in REAP." But they provide no citation to the record in support of this assertion. Kim testified the Kim plaintiffs could not raise the rent while the property was in REAP and for one subsequent year. When he was asked, "[D]id you lose five years' worth of rental increases because of REAP?," Kim responded, "Yes." The challenge is that neither Kim nor another witness calculated the lost rental income during the period the property was in REAP (or the following year). In her closing argument, Bullock simply asserted, "[Kim] lost the rental increases because the property was prolonged in REAP for another three years. That means he lost three years of rent control increases, along with all that rent that he didn't get."

Even assuming the rent column on the rent loss charts reflected the rent due on all apartments in REAP and the

vacancy column reflected the rent not paid due to a vacancy, the record on appeal does not contain exhibit 220, which according to Kim reflects rent losses during 2014. Thus, we cannot tell what rent was charged in 2014 or the rent lost due to vacancies. And the record is devoid of any evidentiary support for the jury's calculation of $22,487 (actually, the unusually precise number of $22,486.94) for future economic loss. Therefore, defendants have met their burden to show that substantial evidence does not support the jury's award of damages for future economic loss. The burden therefore shifted to the Kim plaintiffs to provide citations to the record and argument explaining the evidentiary support for the jury's calculation, which they have not done. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363 ["If a party's briefs do not provide legal argument and citation to authority on each point raised, "'the court may treat it as waived, and pass it without consideration.'""]; *In re Marriage of Davila & Mejia* (2018) 29 Cal.App.5th 220, 227 ["'Issues not supported by citation to legal authority are subject to forfeiture.'"].) It is not our task on appeal to speculate how the jury calculated the award in the absence of any guidance from a witness, the Kim plaintiffs' trial attorneys, or appellate counsel as to how the future rent loss figure should have been calculated. Further, even if we were to assume the rent and vacancy rates in 2014 were comparable to those in 2013 and 2015, there is no evidentiary basis for the jury's future economic loss award, and thus substantial evidence does not support the award.

5. *Substantial evidence does not support the jury's award of noneconomic damages*

Defendants contend substantial evidence does not support the jury's award of damages for past noneconomic loss, including mental suffering. They argue neither Kim nor Kang testified at trial they experienced mental suffering or other noneconomic harm due to defendants' fraudulent concealment and Cho did not testify at trial.

The Kim plaintiffs make no argument to the contrary and provide no citation to any such record evidence. Our review of the record reveals no evidence Kim, Kang, or Cho mentally suffered or otherwise incurred noneconomic injury because of defendants' conduct. Although "the testimony of a single person, *including the plaintiff*, may be sufficient to support an award of emotional distress damages" (*Knutson v. Foster* (2018) 25 Cal.App.5th 1075, 1096), the record here does not appear to include such testimony.[16] Thus, the jury's award of $84,000 in noneconomic damages is not supported by substantial evidence.[17]

---

[16] At oral argument the Kim plaintiffs' attorney pointed to Kim's testimony that he "lost the trust with . . . mankind" and realized mankind was "very devious." This testimony does not show emotional distress suffered by Kim.

[17] Because we conclude substantial evidence does not support the jury's award of noneconomic damages, we do not reach defendants' contention of instructional error regarding emotional distress damages. We note, however, that "[s]ection 3343 delineates in detail the damages recoverable for fraud in property transactions, and does not include a provision for recovery of damages for emotional distress." (*Branch v. Homefed Bank* (1992) 6 Cal.App.4th 793, 798.)

6. *The trial court must recalculate prejudgment interest*

Because we reverse the jury's award of damages on the Kim plaintiffs' claim of fraudulent concealment for future economic loss, noneconomic loss, and a portion of lost earnings, prejudgment interest must be recalculated.

F. *The Trial Court Did Not Err in Finding the Kim Plaintiffs Were Entitled to Attorneys' Fees*

1. *Proceedings below*

On February 8, 2019 the Kim plaintiffs and GNE filed a motion for attorneys' fees with supporting documentation. In their motion, the Kim plaintiffs sought to recover attorneys' fees pursuant to Civil Code section 1717 and Code of Civil Procedure section 1021, relying on the attorney fee provision in the escrow agreement. The escrow agreement provided, "In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorney's fees and costs from the non-prevailing Buyer or Seller, except as provided in paragraph 21A of the original purchase agreement."[18] The Kim plaintiffs argued they were the prevailing party in the action and their claims arose out of the escrow agreement, entitling them to recover their attorneys' fees. The Kim plaintiffs requested $591,936 in attorneys' fees, plus application of a multiplier.

Defendants opposed the motion as to the Kim plaintiffs on the ground the attorney fee provision in the escrow agreement did not support recovery of attorneys' fees in a tort action. As to

---

[18] It is undisputed the parties never entered into a purchase agreement. Rather, the terms of the sale were included in the escrow agreement.

GNE, defendants argued the parties' agreement for remediation work (the invoice) did not contain an attorney fee provision. Defendants also challenged the amount of the requested fees.

At a hearing on May 10, 2019, the trial court found the Kim plaintiffs were entitled to attorneys' fees, but not GNE. On June 4, 2019, after supplemental briefing on the amount of the award, the court granted the Kim plaintiffs' motion and ordered plaintiffs' counsel to prepare a judgment for the court's signature. Although the June 4 minute order does not reflect the amount of fees awarded, defendants' attorney submitted a declaration on September 26, 2019 stating the court had orally pronounced plaintiffs had reasonably incurred $450,000 in attorneys' fees.[19] On December 11, 2019 the court signed an amended judgment setting forth the amounts awarded by the jury to the Kim plaintiffs and GNE, and awarding the Kim plaintiffs $412,500 in attorneys' fees. Defendants timely appealed the amended judgment.

### 2. *Governing law and standard of review*

"With regard to an award of attorney fees in litigation, California generally follows what is commonly referred to as the 'American Rule', which provides that each party to a lawsuit

_____

[19] According to defendants' attorney James Mortensen, plaintiffs had not proposed an order on their motion for attorneys' fees as of September 24, 2019, so Mortensen submitted his declaration and a proposed order. Although Mortensen stated in his declaration the Kim plaintiffs' reasonable fees were $450,000, it appears the court ruled that $450,000 was the total amount of reasonable fees, with $412,500 allocated to work for the Kim plaintiffs.

must ordinarily pay his or her own attorney fees." (*Tract 19051 Homeowners Assn. v. Kemp* (2015) 60 Cal.4th 1135, 1142; accord, *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751 (*Mountain Air*).) This rule is codified in Code of Civil Procedure section 1021,[20] but that section also "permits parties to '"contract out" of the American rule' by executing an agreement that allocates attorney fees." (*Mountain Air*, at p. 751; accord, *R.W.L. Enterprises v. Oldcastle, Inc.* (2017) 17 Cal.App.5th 1019, 1025.) ""'Parties may validly agree that the prevailing party will be awarded attorney fees incurred in any litigation between themselves, whether such litigation sounds in tort or in contract.'"" (*Mountain Air*, at p. 751.) Contracting parties may also "limit the recovery of fees only to claims arising from certain transactions or events, or award them only on certain types of claims." (*Brown Bark III, L.P. v. Haver* (2013) 219 Cal.App.4th 809, 818 (*Brown Bark*).)

""'On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law.'" [Citations.] In other words, 'it is a discretionary trial court decision on the propriety or amount of statutory attorney fees to be awarded, but a determination of the legal basis for an attorney fee award is a

---

[20] Code of Civil Procedure section 1021 provides in relevant part, "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties . . . ."

49

question of law to be reviewed de novo.'" (*Mountain Air, supra*, 3 Cal.5th at p. 751; accord, *Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 407; see *Eden Township Healthcare Dist. v. Eden Medical Center* (2013) 220 Cal.App.4th 418, 425 ["'On appeal this court reviews a determination of the legal basis for an award of attorney fees de novo as a question of law.'"].)

In deciding the scope of an attorney fee provision, we apply traditional rules of contract interpretation. (*Mountain Air, supra*, 3 Cal.5th at p. 752; accord, *Orozco v. WPV San Jose, LLC, supra*, 36 Cal.App.5th at p. 407.) "Our initial inquiry is confined to the writing alone. [Citations.] '"The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.] Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.]"' [Citations.] At the same time, we also recognize the 'interpretational principle that a contract must be understood with reference to the circumstances under which it was made and the matter to which it relates.'" (*Mountain Air*, at p. 752; accord, *Xuereb v. Marcus & Millichap, Inc.* (1992) 3 Cal.App.4th 1338, 1342 (*Xuereb*).)

Neither party has presented extrinsic evidence to interpret the escrow agreement. Because defendants on appeal only raise the legal question whether the attorney fee provision in the escrow agreement provides for recovery of fees on the Kim

50

plaintiffs' fraudulent concealment claim,[21] we apply a de novo standard of review.  (*Mountain Air, supra*, 3 Cal.5th at p. 751.)

> 3.  *The attorney fee provision in the escrow agreement applies to the Kim plaintiffs' fraudulent concealment claim*

As discussed, the attorney fee provision in the escrow agreement provides for the prevailing party to recover reasonable attorneys' fees in "any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement . . . ."  Defendants contend this provision should be read narrowly not to apply to the Kim plaintiffs' fraudulent concealment claim because it arose out of a common law duty to disclose, not the escrow agreement, and it predated the escrow agreement.  We conclude otherwise.

Contrary to defendants' position, the appellate courts have interpreted attorney fee provisions in property purchase agreements authorizing the recovery of fees incurred in an action "arising out of" the agreement broadly to cover a party's tort claims.  (See *Lerner v. Ward* (1993) 13 Cal.App.4th 155, 157, 160 (*Lerner*) [construing language in agreement for purchase of property allowing recovery of attorneys' fees incurred "arising out of this agreement" broadly to apply to claim that seller fraudulently induced plaintiffs to enter into agreement by falsely representing that property could be subdivided]; *Xuereb, supra*, 3 Cal.App.4th at pp. 1340, 1343 [plaintiffs were entitled to recover attorneys' fees for fraud and related claims alleging sale of defective property based on attorney fee provision in purchase

---

[21]  The same analysis would apply to the Kim plaintiffs' claim for negligent misrepresentation.  For simplicity, we focus on the fraudulent concealment claim.

agreement that provided for recovery of fees "'[i]f this Agreement gives rise to a lawsuit or other legal proceeding between any of the parties'"]; see also *Santisas v. Goodin* (1998) 17 Cal.4th 599, 608 [provision in purchase agreement stating attorneys' fees were recoverable for claims "'arising out of the execution of th[e] agreement or the sale'" was a broad provision that supported recovery of fees for plaintiffs' fraud and related claims alleging defects in home].)

The holding in *Xuereb* is instructive. There, the buyers of property sued the real estate broker and agent, asserting fraudulent concealment and other claims relating to the sale. (*Xuereb, supra*, 3 Cal.App.4th at p. 1340.) The Court of Appeal held the language in the purchase agreement providing for recovery of attorneys' fees by the prevailing party if the lawsuit or other legal proceeding was one "to which 'this Agreement gives rise'" was "broad enough to encompass both contract actions and actions in tort . . . ." (*Id.* at pp. 1342-1343.) The defendants, as here, argued the lawsuit did not arise from the purchase agreement because all the alleged omissions and misstatements occurred prior to execution of the agreement. (*Ibid.*) The Court of Appeal rejected this argument, explaining, "[B]ut for the execution of the Purchase Agreement and the subsequent close of escrow, respondents would have had no basis on which to claim detrimental reliance or damages, as alleged in their lawsuit." (*Id.* at p. 1344.) The court concluded, "[T]he various tort causes of action set forth against [the broker and agent] in [the buyers'] complaint and tried before the jury must be said to have arisen from the Purchase Agreement. None of them was 'quite independent of the basic contractual arrangement'; they arose

52

from the underlying transactional relationship between the parties, as memorialized by the Purchase Agreement." (*Ibid*.)

*Exxess Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698, relied on by defendants, is distinguishable. There, a commercial property owner sued a tenant for breach of the lease, and the tenant filed a cross-complaint for fraud and breach of fiduciary duty against the property broker, alleging the broker concealed defects in the property known before execution of the lease. (*Id.* at pp. 702-703.) After the case settled, the broker sought fees as a prevailing party pursuant to the lease agreement, which provided for the recovery of fees by a prevailing party in "'an action or proceeding to enforce the terms hereof or declare rights'" under the agreement. (*Ibid*.) The Court of Appeal concluded the broker was not entitled to recover its fees because the tenant's claims for fraud and breach of fiduciary duty were not claims to enforce the terms of the lease or to declare rights under it, but instead "were premised on a duty that arose without regard to the terms of the lease and before the lease existed." (*Id.* at p. 711.) Notably, the attorney fee provision in *Exxess Electronixx*, unlike the escrow agreement, did not provide for the recovery of fees arising out of the agreement. As the Court of Appeal explained, "the provision before us appears to be quite narrow." (*Id.* at p. 712.) The court contrasted the fee provision at issue there with "broader provisions to permit an award of attorneys' fees on a tort claim," including the provisions at issue in *Santisas v. Goodin, supra*, 17 Cal.4th at page 607 and *Xuereb, supra*, 3 Cal.App.4th at page 1343 authorizing fees in actions arising out of the agreements. (*Exxess Electronixx*, at pp. 712-713.)

The gravamen of the Kim plaintiffs' fraudulent concealment claim is that defendants' concealment of the Health Department violations induced them to purchase the property. The parties memorialized the purchase transaction in the escrow agreement, and thus, as in *Lerner* and *Xuereb*, the Kim plaintiffs' claim for fraudulent concealment was an action arising from the escrow agreement.  (See *Lerner, supra*, 13 Cal.App.4th at p. 160; *Xuereb, supra*, 3 Cal.App.4th at p. 1344.)

## DISPOSITION

The judgment in favor of the Kim plaintiffs is modified by reducing the award of damages from $992,596 to $855,138 (reflecting a reduction of $29,970 for lost earnings ($272,569 awarded reduced to $242,599); $22,487 for future economic loss; and $85,000 for past noneconomic loss).  We remand for the trial court to recalculate prejudgment interest.  In all other respects, we affirm the judgment, including the award of attorneys' fees. The parties are to bear their own costs on the appeal in case No. B295665.  The Kim plaintiffs are to recover their costs on appeal in case No. B303317.

FEUER, J.

We concur:

PERLUSS, P. J.          SEGAL, J.

54